UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MORGAN V. THOMAS,

                Plaintiff,

                                          Case No. 21-cv-1385-pp

    v.

KILOLO KIJAKAZI,

                Defendant.

---

**ORDER AFFIRMING FINAL ADMINISTRATIVE DECISION OF COMMISSIONER**

---

On December 6, 2021, the plaintiff filed an appeal seeking review of the portion of an administrative law judge's decision that found her not "disabled" within the meaning of the Social Security Act starting March 9, 2020. Dkt. No. 1. The Social Security Administration's Appeals Council denied review, rendering the administrative law judge's decision the final decision of the Commissioner. The court affirms the Commissioner's decision.

**I.**     **Procedural History and the ALJ's Decision**

On November 19, 2019, the plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of January 15, 2018. Dkt. No. 9-3 at 17. The Social Security Administration (SSA) initially denied the plaintiff's claim on May 13, 2020, dkt. no. 9-7 at 2, and denied the claim on reconsideration on September 9, 2020, dkt. no. 9-7 at 11. The plaintiff requested a hearing before an administrative law judge (ALJ). On

1

March 1, 2021,[1] the plaintiff appeared at a telephone hearing[2] represented by Attorney Justin T. Padway. Dkt. No. 9-3 at 17. Both the plaintiff and vocational expert (VE) Jacquelyn Wenkman testified. Id.; Dkt. No. 9-5 at 23–46, 47–60.

ALJ Arman Rouf issued a partially favorable decision on May 5, 2021. Dkt. No. 9-3 at 17–38. The ALJ found that the plaintiff's earnings record showed that the plaintiff had "acquired sufficient quarters of coverage to remain insured through December 31, 2019." Id. at 17. The ALJ found that the plaintiff "was under a disability, as defined by the Social Security Act, from January 15, 2018 through March 8, 2020." Id. at 28 (citing 20 CFR 404.1520(g)). The ALJ found, however, that the plaintiff's "disability ended March 9, 2020," and that the plaintiff had "not become disabled again since that date." Id. at 38 (citing 20 CFR 404.1594(f)(8)). The ALJ concluded that "[m]edical improvement occurred as of March 9, 2020," id. at 30, which the statute defines as "any decrease in the medical severity of impairment(s) present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled and is determined by a comparison of prior and current medical evidence which must show that there have been

---

[1] The hearing transcript consistently lists the date of the hearing as March 1, 2020. Dkt. No. 9-5 at 14, 16, 61. The court assumes this is a typo.

[2] The ALJ's decision stated that the hearing was held via telephone "due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic." Dkt. No. 9-3 at 17. The ALJ stated that "[a]ll participants attended the hearing by telephone" and that "[t]he claimant consented to a telephonic hearing." Id. See Dkt. No. 9-5 at 16–18 (confirming plaintiff's consent at the hearing).

2

changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)." 20 C.F.R. §404.1594(c)(1).

In evaluating a claim for disability benefits, the ALJ must follow a five-step, sequential process. Apke v. Saul, 817 F. App'x 252, 255 (7th Cir. 2020). For determining whether a claimant's disability continued after a certain point, ALJs apply a slightly different, eight-step sequential process. See 20 C.F.R. §404.1594(f); Brown v. Saul, 799 F. App'x 915, 918 (7th Cir. 2020); Murphy v. Berryhill, 727 F. App'x 202, 206 (7th Cir. 2018); Blevins v. Astrue, 451 F. App'x 583, 584 (7th Cir. 2011); Rucker v. Astrue, No. 07–C–0999, 2010 WL 1286968, at *5 (E.D. Wis. Mar. 30, 2010).[3] The following chart summarizes the ALJ's findings at each step for the period beginning March 9, 2020:

| STEP | FINDINGS |
|---|---|
| Step One: Is the claimant engaged in substantial gainful activity? | The claimant has not engaged in substantial gainful activity since January 15, 2018, the date the claimant became disabled. |
| Step Two: Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? | Beginning March 9, 2020, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. |
|  |  |

---

[3] See also Phillips v. Astrue, 601 F. Supp. 2d 1020, 1026 (N.D. Ill. Mar. 6, 2009); Shannon v. Saul, No. 19-C-504, 2020 WL 7027883, at *4 (E.D. Wis. Nov. 30, 2020); Kimberly T. v. Saul, No. 19 C 487, 2019 WL 6310016, at *1 (N.D. Ill. Nov. 25, 2019); Cook v. Comm'r of Soc. Sec., No. 3:17-CV-552-MGG, 2019 WL 1110412, at *1–2 (N.D. Ind. Mar. 8, 2019).

3

| | |
|---|---|
| <u>Step Three</u>: Has there been medical improvement as defined in 20 C.F.R. §404.1594(b)(1)? | Medical improvement occurred as of March 9, 2020, the date the claimant's disability ended. |
| <u>Step Four</u>: If there has been medical improvement, is it related to the claimant's ability to do work, *i.e.*, has there been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination? | The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity. |
| <u>Step Five</u>: If there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, do any exceptions apply? | Irrelevant; step four was satisfied, so the analysis proceeds to step six. |
| <u>Step Six</u>: Is the impairment or combination of impairments severe—does it significantly limit the claimant's mental or physical ability to do basic work activities? | The claimant has not developed any new impairment or impairments since March 9, 2020, the date the claimant's disability ended.<br><br>The claimant's current severe impairments are the same as those present from January 15, 2018 through March 8, 2020: cerebral vascular accident, aneurysm, phonological dyslexia and dysgraphia, right-sided spastic hemiparesis, moyamoya disease, adjustment disorder with depressed mood, traumatic brain injury ("TBI"), and major depressive disorder. |

4

|  |  |
|---|---|
| **Step Seven**: Does the claimant's residual functional capacity allow the claimant to perform past relevant work? | The claimant is unable to perform past relevant work as a paralegal.<br><br>Beginning March 9, 2020, the claimant has had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can never climb ladders, ropes, or scaffolds. She can frequently handle and finger with the right upper extremity. She can occasionally push or pull with the right lower extremity. She must avoid unprotected heights and dangerous machinery. She is limited to communicating simple information. She is limited to writing and typing simple and brief sentences. She can perform simple and routine tasks. She can maintain attention and concentration for two-hour segments. She can make simple work-related decisions. She can tolerate occasional changes in a routine work setting. |
| **Step Eight**: Can the claimant perform any other work existing in significant numbers in the national economy? | Compact assembler, machine tender, sorter |

See Dkt. No. 9-3 at 20, 21, 28, 30, 31, 36, 37.

The ALJ concluded that the plaintiff was disabled "from January 15, 2018 through March 8, 2020, but has not been disabled as of March 9, 2020."

5

Dkt. No. 9-3 at 38. On November 9, 2021, the Appeals Council denied review. Dkt. No. 9-3 at 2–3. The Appeals Council noted that the plaintiff had provided additional records for its review,[4] but found "this evidence [did] not show a reasonable probability that it would change the outcome of the decision" and therefore "did not exhibit this evidence." Id. at 3.

On December 6, 2021, the plaintiff appealed, seeking this court's review of the unfavorable portion of the final administrative decision. Dkt. No. 1. The plaintiff is represented on appeal by Attorney Justin T. Padway. The plaintiff asks the court to reverse the ALJ's decision and find that the plaintiff remains disabled and is entitled to disability benefits under the Social Security Act. Dkt. No. 10 at 25. Alternatively, the plaintiff seeks remand under sentence four of 42 U.S.C. §405(g). Id.; Dkt. Nos. 21 at 12; 29 at 5. The plaintiff also requests that if the court does not remand under sentence four, the court consider remand under sentence six of 42 U.S.C. §405(g).[5] Dkt. Nos. 21 at 12, 29 at 5.

---

[4] The Appeals Council summarized this evidence as "records from Jay Balachandran MD dated May 5, 2021 (1 page); Ascension Prospect Medical Commons dated December 28, 2021 through March 22, 2021 (13 pages); Jay Balachandran M.D. dated February 15, 2021 (5 pages); Ascension Columbia St Mary's Hospital date July 6, 2020 (7 pages) and Ascension AMG at Mequon dated April 19, 2021 through April 20, 2021 (29 pages)." Dkt. No. 9-3 at 3.

[5] The court held a status conference on June 22, 2023, at which it noted that the plaintiff's request for relief was not clear and asked the plaintiff to clarify whether she sought dual remand under sentence four *and* sentence six or was seeking sentence four remand and, in the event that was unsuccessful, then sentence six remand. See Dkt. Nos. 25 (hearing audio), 27 (court minutes). The plaintiff confirmed she was seeking sentence four remand and, *alternatively*, sentence six remand.

6

On August 10, 2023, the court held a hearing at which the court informed the parties that it would be issuing a written order affirming the ALJ's decision, but briefly summarized what the parties could anticipate in that decision. Dkt. No. 32. See also Dkt. No. 31 (hearing audio).

## II.    Standard of Review

When the Appeals Council denies a plaintiff's request for review, the ALJ's decision constitutes the final decision of the Commissioner. Gedatus v. Saul, 994 F.3d 893, 898 (7th Cir. 2021). Section 405(g) of Title 42 limits the court's review; the district court must uphold the decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. §405(g); Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009) (citation omitted). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. Jelinek, 662 F.3d at 811. If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be

7

affirmed if the decision is adequately supported. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both evidence that supports the ALJ's conclusions and evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Id. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). Judicial review is limited to the rationales offered by the ALJ. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93–95 (1943)). The ALJ must follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. See Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir. 2006). A reviewing court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (quoting Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)). The district court will uphold a decision so long as the record reasonably supports it and the ALJ explains her analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

### III.    Analysis of Request for Remand Under Sentence Four

The plaintiff does not disagree with the ALJ's favorable finding that she was disabled from January 15, 2018, through March 8, 2020. The plaintiff appeals only the ALJ's finding that beginning March 9, 2020, she "had a medical improvement that ended her disability and enabled her to work a 40 hour a week job." Dkt. No. 10 at 14. The plaintiff argues that the evidence in the record does not support this finding and that contrary to the ALJ's finding, she "did not have sufficient improvement which allowed her to find and maintain gainful employment." Id.

The plaintiff presents five reasons that she believes the ALJ erred and that remand under sentence four is necessary: (1) the ALJ's finding that the plaintiff was no longer disabled after March 9, 2020 lacked substantial evidence; (2) the ALJ failed to consider multiple "severe" impairments in crafting the RFC; (3) the ALJ improperly considered Dr. Schramm's medical opinion; (4) the ALJ erred in analyzing the severity of the plaintiff's mental impairments; and (5) the RFC did not adequately account for the plaintiff's mental limitations. Dkt. No. 10 at 14–16, 17, 19, 22, 24.

A.    ALJ's Finding that Plaintiff Was Not Disabled After March 9, 2020

The plaintiff's brief begins with a section titled "[The plaintiff] remained disabled after March 9, 2020." Dkt. No. 10 at 14–16. The content of this section appears to be an argument that the ALJ's finding was not "substantially

9

justified by the evidence in the record"[6] and did not have "a reasonable basis in law and fact" because "the ALJ based his decision solely on the neuropsychological test conducted by Doctor Laura Umfleet on March 9, 2020, and to the exclusion of all other evidence in the record." Id. at 14–15 (citing Stewart v. Astrue, 561 F.3d 679, 683 (7th Cir. 2009); Pierce v. Underwood, 487 U.S. 552, 565 (1988); Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009)).

The court "will affirm a decision on disability benefits if the ALJ supported [his] conclusion with substantial evidence." Karr v. Saul, 989 F.3d 508, 511 (7th Cir. 2021) (citing 42 U.S.C. §405(g); Biestek, 139 S. Ct. at 1152). "Substantial evidence is not a high threshold, as it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Prill v. Kijakazi, 23 F.4th 738, 746 (7th Cir. 2022) (quoting Karr, 989 F.3d at 511). "In rendering a decision, an ALJ is not required to provide a complete and written evaluation of every piece of testimony and evidence, but must build a logical bridge from the evidence to his conclusion." Minnick v. Colvin, 775 F.3d 929, 935 (7th Cir. 2015) (citation and internal quotations omitted). See also Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (stating that the ALJ must provide an "accurate and logical bridge" from the evidence to the conclusion).

The ALJ found that "medical improvement occurred as of March 9, 2020, the date the claimant's disability ended." Dkt. No. 9-3 at 30. The ALJ began his

---

[6] See Dkt. No. 17 at 11–12 (Commissioner's brief arguing that the plaintiff misstates the applicable standard of review and incorrectly puts the burden on the ALJ).

discussion with Dr. Umfleet's neuropsychological evaluation, which showed some improvements in the plaintiff's cognitive abilities including "improved auditory comprehension, reading comprehension, and vocabulary, less paraphasias, and improved attention." Id. (citing Dkt. No. 9-24 at 55–63). The ALJ did not impermissibly "cherry-pick" portions of this evaluation, however; he also acknowledged results of the exam demonstrating the plaintiff's remaining difficulties:

> Examination showed she exhibited persistent weaknesses that continued to be consistent with phonological dyslexia and dysgraphia secondary to her stroke. She exhibited significant weaknesses with writing (dysgraphia) and reading (dyslexia). The claimant reported persistent fatigue with difficulty sleeping and napping one and a half to two hours per day. Her sentences were somewhat difficult to follow due to dysgraphia. The claimant's ability to converse was clearly stronger than her ability to put her thoughts together via writing. She indicated that on a test of fine motor dexterity, her right hand continued to be weaker than her left with pain increased on her right side.

Id. (citing Dkt. No. 8F).

Nonetheless, the ALJ found that the medical improvement that *had* occurred was "related to the ability to work because there [was] an increase in the claimant's residual functional capacity." Dkt. No. 9-3 at 31. In crafting a new RFC, the ALJ summarized the plaintiff's reported symptoms and activities in treatment records from June 3 and July 7, 2020, noting both improvements and continuing struggles. Id. (citing Dkt. Nos. 9-24 at 105; 9-26 at 21). The ALJ then summarized the plaintiff's physical therapy records and noted that the plaintiff had reported to her primary care provider on September 3, 2020 that she was still undergoing speech therapy and would require more

11

occupational therapy. Id. at 32 (citing Dkt. Nos. 9-26 at 7–8; 9-30 at 19–20; 9-31 at 1–9; 9-27 at 52). The ALJ discussed the plaintiff's continuing occupational therapy records and physical exam findings. Id. (citing Dkt. Nos. 9-32 at 20; 9-33 at 5, 9).

Turning to the plaintiff's mental impairments, the ALJ discussed and summarized a variety of records and mental status examinations that included the plaintiff's subjective reports and objective findings. Dkt. No. 9-3 at 32–33 (citing Dkt. Nos. 9-28 at 3, 10; 9-29 at 2; 9-30 at 8, 9, 15, 16; 9-31 at 15–16; 9-33 at 13; 9-34 at 7, 40; 9-26 at 37, 46, 49; 9-24 at 105; 9-32 at 13; 9-33 at 13; 9-24 at 55–63). The ALJ then returned to Dr. Umfleet's March 9, 2020 neurological evaluation, again summarizing the positive and negative findings. Id. at 33 (citing Dkt. No. 9-24 at 55–63). And the ALJ acknowledged the plaintiff's own reports of her abilities to manage her own medications and her increased independence in activities. Id. (citing Dkt. Nos. 9-26 at 15; 9-33 at 4).

The ALJ also summarized and discussed the plaintiff's continuing speech and language therapy, citing treatment notes, the plaintiff's reports to providers and objective exam findings. Dkt. No. 9-3 at 33 (citing Dkt. No. 9-26 at 16, 79). The ALJ noted that in October 2020, the plaintiff's "therapist noted a decreased need for frequency of therapy" and that the plaintiff "was discharged from speech and language therapy on October 14, 2020." Id. (citing Dkt. No. 9-28 at 31). The ALJ also referred to the plaintiff's attempted return to law school in the fall of 2020:

> Treatment records on July 15, 2020 reflect that the claimant reported she met with the dean of her law school and director of

12

disability services and they suggested she start with one online course, although the claimant wanted to take two courses. On August 21, 2020, she reported that she registered for a criminal process course that met twice weekly. . . . She reported she performed better on her law school midterm than expected and she was given thirty minutes extra to complete the exam. She reported that her husband helped her type her answers. She had thirty minutes left to revise her answers and she was able to do so without assistance. (Exhibit 19F/33) In November 2020, the claimant reported she had to drop her class on the recommendation of the dean, as she was unable to keep up with the demands of the class. (Exhibits 13F/2; 18F/2, 5, 35)

Id. at 33–34.

Contrary to the plaintiff's assertion, the ALJ did not base his decision that the plaintiff was no longer disabled after March 9, 2020 "solely on" Dr. Umfleet's March 9, 2020 neuropsychological evaluation "to the exclusion of all other evidence in the record." Dkt. No. 10 at 15. Nor did the ALJ "equate" the results of Dr. Umfleet's evaluation to a finding that the plaintiff was "no longer . . . disabled." Rather, the ALJ properly continued with the multi-step, sequential Social Security analysis in 20 C.F.R. §404.1594(f)—considering all evidence in the record after March 9, 2020, evaluating the medical opinions and determining whether the plaintiff was able to perform any past relevant work or capable of making a successful adjustment to work that exists in significant numbers in the national economy. Dkt. No. 9-3 at 28–38.

The plaintiff also argues that she "was diagnosed with additional medical conditions after March 9, 2020 that validated her symptoms prior thereto and inhibit her ability to work." Dkt. No. 10 at 16. Specifically, the plaintiff states that she was diagnosed with narcolepsy in April 2020, dkt. no. 9-4 at 2–3, incontinence in June 2020, dkt. no. 9-27 at 37–51, and chronic pain in

13

September 2021, dkt. no. 10-2 at 2–4. Id. However, in support of her narcolepsy and chronic pain diagnoses, the plaintiff cites documents that were not before the ALJ. Documents that were not before the ALJ are not relevant to a request for remand under sentence four. As to the plaintiff's diagnosis of urinary incontinence, the court will explain in greater detail below that the ALJ did not err in his consideration of the plaintiff's urinary incontinence when crafting the RFC and evaluating whether the plaintiff was disabled after March 9, 2020.

The ALJ's decision that the plaintiff had had "medical improvement" related to work as of March 9, 2020 was supported by substantial evidence and the ALJ did not impermissibly "cherry-pick" portions of the record. The court will not remand on this ground.

B. Failure to Consider Multiple Impairments in Determining RFC

The plaintiff argues that the ALJ "failed to address or consider numerous severe impairments when determining [the plaintiff's] residual functional capacity." Dkt. No. 10 at 17. The RFC determination takes place at step four under 20 C.F.R. §404.1520(a)(4) and step seven under 20 C.F.R. §404.1594(f), but the plaintiff's next sentence asserts that the ALJ "failed to consider *at step three* multiple impairments." Id. (emphasis added). The plaintiff also invokes a step *two* argument, referring to each of the allegedly ignored impairments as "severe" and asserting "[a]n impairment can be considered as 'not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work

14

irrespective of age, education, or work experience.'" <u>Id.</u> at 17–18 (quoting SSR 85-28).

The court does not construe this section of the plaintiff's brief as arguing that the ALJ erred at step three of the Social Security analysis. The plaintiff does not mention any listing from 20 CFR Part 404, Subpart P, Appendix 1 that the ALJ failed to consider or otherwise argue that the ALJ should have found that an impairment or combination of impairments met or medically equaled the severity of one of the listed impairments.

To the extent the plaintiff meant to argue that the ALJ erred at step two and should have found that certain impairments were "severe," the Seventh Circuit repeatedly has stated that "even if there were a mistake at Step 2, it does not matter." <u>Arnett v. Astrue</u>, 676 F.3d 586, 591 (7th Cir. 2012). "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." <u>Ray v. Berryhill</u>, 915 F.3d 486, 492 (7th Cir. 2019) (citing <u>Arnett</u>, 676 F.3d at 591). <u>See also</u> <u>Curvin v. Colvin</u>, 778 F.3d 645, 649 (7th Cir. 2015) ("Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even one severe impairment."). "Either way, the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." <u>Ray</u>, 915 F.3d at 492 (citations omitted). The ALJ found that the plaintiff had the following severe

impairments: cerebral vascular accident, aneurysm, phonological dyslexia[7] and dysgraphia,[8] right-sided spastic hemiparesis,[9] moyamoya disease,[10] adjustment disorder with depressed mood, traumatic brain injury ("TBI"), and major depressive disorder. Dkt. No. 9-3 at 21, 28. The ALJ therefore continued with the analysis and step two error would be harmless.

Regarding the ALJ's RFC determination at step four/seven, the plaintiff argues that the ALJ failed to consider her (1) residual word finding difficulty, slow processing, attention deficit disorder and aphasia; (2) ongoing and severe fatigue; (3) chronic insomnia and narcolepsy; (4) chronic pain; and (5) incontinence and frequent need to urinate. Dkt. No. 10 at 17–18. See also Dkt. No. 21 at 7 (plaintiff's reply brief listing these impairments). The court will address each of these conditions.

---

[7] "Phonological dyslexia is extreme difficulty reading that is a result of phonological impairment, meaning the ability to manipulate the basic sounds of language." https://www.dyslexia-reading-well.com/phonological-dyslexia.html.

[8] "Adults with dysgraphia often have a hard time writing by hand and may struggle with letter formation, letter, word and line spacing, staying inside the margins, neatness, capitalization/punctuation rules, spelling, word choice, and even grammar." https://www.readandspell.com/us/dysgraphia-in-adults.

[9] Spastic hemiparesis refers to a condition in which "one half of the body is afflicted with weakness, but is not paralyzed." https://www.brainandspinalcord.org/spastic-hemiplegia/.

[10] "Moyamoya disease is a rare, progressive cerebrovascular disorder caused by blocked arteries at the base of the brain in an area called the basal ganglia;" the disease may cause brain bleeds leading to strokes and cognitive or sensory impairment. https://www.ninds.nih.gov/health-information/disorders/moyamoya-disease.

1. *Residual Word Finding Difficulty, Slow Processing, Attention Deficit and Aphasia*

The plaintiff argues that the ALJ failed to consider her residual word finding difficulty, slow processing, attention deficit disorder and aphasia.[11] Dkt. No. 10 at 17 (citing Dkt. Nos. 9-26 at 2–4; 9-34 at 45–51). The Commissioner argues that the plaintiff has not explained why these difficulties should be characterized as separate impairments rather than manifestations of the impairments identified by the ALJ. Dkt. No. 17 at 16. In response, the plaintiff contends that the Commissioner is "offering a medical opinion without the requisite expertise." Dkt. No. 21 at 7.

According to the plaintiff, these impairments are "prevalent and a deterrent to her employment," but the ALJ did not consider them in his decision. Dkt. No. 10 at 17. In support, the plaintiff points to records from a July 15, 2020 speech pathology visit that refer to medical diagnoses of basal ganglia hemorrhage (a severe type of stroke) and TBI (traumatic brain injury) and a treatment diagnosis of "other symbolic dysfunction." Dkt. No. 9-26 at 2–3. The speech pathologist's notes stated that the plaintiff "present[ed] with diagnosis of basal ganglia hemorrhage *resulting in* mild language (both phonological and semantic-based issues) and executive functioning deficits." Id. at 4 (emphasis added). The plaintiff also highlights a February 15, 2021 mental medical opinion and letter authored by Dr. Andrew Schramm, PhD,

---

[11] "Aphasia is a language disorder caused by damage in a specific area of the brain that controls language expression and comprehension. Aphasia leaves a person unable to communicate effectively with others." https://www.hopkinsmedicine.org/health/conditions-and-diseases/aphasia.

which state that the plaintiff has "significant word-finding issues, slowed processing speed," and "attention deficits," as well as "significant cognitive deficits *due to stroke*." Dkt. No. 9-34 at 45, 48 (emphasis added). In his letter, Dr. Schramm explained that the plaintiff's medical history includes intracranial hemorrhage and basal ganglia aneurysm (stroke). Id. at 51. Dr. Schramm stated that the plaintiff's "attention deficits, *due to stroke*, have persisted" despite medication and that the plaintiff "often has word-finding difficulties," "is easily distracted and loses her train of thought frequently." Id. (emphasis added).

The Commissioner's assertion that these deficits were a manifestation of the impairments that the ALJ considered is not the Commissioner's medical opinion; the records highlighted in the plaintiff's brief demonstrate that the plaintiff's treating provider identified these deficits as resulting from impairments the ALJ *did* consider. The ALJ explicitly found that the plaintiff's severe impairments included cerebral vascular accident, aneurysm, phonological dyslexia and dysgraphia, right-sided spastic hemiparesis, moyamoya disease and traumatic brain injury ("TBI"). Dkt. No. 9-3 at 21. See also id. at 28 (explaining that the plaintiff had not developed any new impairments since March 9, 2020, and thus the plaintiff's severe impairments for the period after March 9, 2020 were "the same as th[ose] present from January 15, 2018 through March 8, 2020").

The court also notes that these impairments (residual word finding difficulty, slow processing, attention deficit and aphasia) are related to the

18

plaintiff's mental impairments, which the plaintiff brings up later in her brief in arguing that the ALJ erred in finding that the plaintiff had only moderate rather than severe mental limitations. The court covers those impairments/limitations in more detail when evaluating that argument, but nevertheless briefly addresses the plaintiff's argument here.

In summarizing the record evidence of the plaintiff's mental impairments, the ALJ noted that abnormal findings from mental status exams included "slightly tangential thought processes." Dkt. No. 9-3 at 29, 32 (citing Dkt. Nos. 9-26 at 37; 9-28 at 3; 9-30 at 16; 9-31 at 15–16; 9-33 at 13). The ALJ observed that the March 9, 2020 neurological evaluation showed that the plaintiff still experienced language difficulties:

> Examination showed she exhibited persistent weaknesses that continued to be consistent with phonological dyslexia and dysgraphia secondary to her stroke. She exhibited significant weaknesses with writing (dysgraphia) and reading (dyslexia). . . . Her sentences were somewhat difficult to follow due to dysgraphia. The claimant's ability to converse was clearly stronger than her ability to put her thoughts together via writing.

Id. at 33 (citing Dkt. No. 9-24 at 55–63). But the ALJ observed that this evaluation also "showed improvement in her cognitive abilities":

> The claimant showed improved auditory comprehension, reading comprehension, vocabulary, less paraphasias, and improved attention. She improved from borderline impaired in 2018 to low average reading comprehension. She exhibited excellent memory, average or better general intellectual abilities, and sustained attention. She exhibited variable processing speed with speed compromised for accuracy.

Id. (citing Dkt. No. 9-24 at 55–63). The ALJ also considered treatment notes from July 7, 2020 indicating that the plaintiff "exhibited mild aphasia with

semantically and phonologically based deficits with observed phonemic paraphasia on two occasions." Id. (citing Dkt. No. 9-26 at 16). And the ALJ noted that the plaintiff was "discharged from speech and language therapy on October 14, 2020." Id.

The ALJ concluded that the medical evidence showed "continuing deficits from [the plaintiff's] stroke," but also found that the record demonstrated substantial improvement, including "sustained attention." Dkt. No. 9-3 at 34. The ALJ acknowledged that the plaintiff still struggled with "variable processing speed with speed compromised for accuracy," but observed that the plaintiff reported that "she was able to complete multiple homework assignments," "was able to follow through with assigned tasks" and worked on "puzzles regularly." Id. As will be discussed in more detail, the ALJ included restrictions in the RFC to account for the plaintiff's mental impairments and limitations:

> She is limited to communicating simple information. She is limited to writing and typing simple and brief sentences. She can perform simple and routine tasks. She can maintain attention and concentration for two-hour segments. She can make simple work-related decisions. She can tolerate occasional changes in a routine work setting.

Id. at 31.

The court cannot agree that the ALJ failed to consider the plaintiff's residual word finding difficulty, slow processing, attention deficit and aphasia.

2.    *Ongoing and Severe Fatigue; Chronic Insomnia and Narcolepsy*

The plaintiff argues that the record is replete with evidence of her "debilitating fatigue." Dkt. No. 10 at 17 (citing Dkt. Nos. 9-12 at 30; 9-19 at 67,

82, 87, 142). The plaintiff asserts that her fatigue has significantly impeded her rehabilitation, attempt at continuing with law school and ability to do daily chores around the house. Id. (citing Dkt. Nos. 9-34 at 37; 9-30 at 4). The plaintiff points out that her fatigue was documented in the March 9, 2020 neurological exam on which the ALJ based his finding that her disability ended on this date. Id. (citing Dkt. No. 9-24 at 55–63).

The plaintiff argues that "an impairment can only be considered as non-severe if it is a slight abnormality that has such a minimal effect on the individual that it would not interfere with the individual's ability to work." Dkt. No. 10 at 17 (citing SSR 85-28). The plaintiff contends that "[t]his severe impairment was not considered." Id. Again, this language suggests an argument that the ALJ erred at step two and should have concluded that the plaintiff's fatigue is a "severe" impairment. Such error is harmless and not a basis for remand. Ray, 915 F.3d at 492.

In support of her argument about her fatigue, the plaintiff points to some records from the period during which the ALJ found that the plaintiff *was* disabled. See Dkt. No. 9-12 at 30 (February 2018); 9-19 at 67 (March 2019), 82, 87 (February 2019), 142 (July 2018). These records are irrelevant in determining whether the plaintiff was no longer disabled as of March 9, 2020. For records after March 9, 2020, the plaintiff points to an August 4, 2020 exam that includes a subjective statement that she was too tired to complete speech therapy homework and an objective note explaining that the plaintiff and the provider discussed the importance of energy conservation. Dkt. No. 9-30 at 4.

The plaintiff points to a December 28, 2020 exam that notes that she was "still feeling tired" and reported that she "sometimes will sleep in late or wake up early" and "gets more than 8 hours" of sleep. Dkt. No. 9-34 at 37.

And the plaintiff emphasizes that the March 9, 2020 neurological exam notes document her fatigue. Dkt. No. 9-24 at 55–63. This report includes subjective statements from the plaintiff that "fatigue can negatively impact her language and other cognitive functions" and that "if she has a busy day then she is tired the next." Id. at 56. A section summarizing her psychiatric history includes statements from the plaintiff regarding her sleep schedule and expressing difficulty with sleep maintenance. Id. at 57. Under the recommendations section, Dr. Umfleet wrote that if she had not already done so, the plaintiff should consider discussing persistent sleep issues with her primary care provider and psychotherapist. Id. at 59. In listing the academic accommodations she recommended if the plaintiff returned to law school, Dr. Umfleet recommended that the plaintiff "should be allowed to take brief breaks during long classes to help with fatigue." Id. In this same report, however, the plaintiff also stated that she believed her energy had "slightly (about 5%) improved over the past year." Id. at 56. And she indicated that she had "started taking Ritalin in January 2020, which has helped her energy level, and she spends less time in bed." Id.

In his decision, the ALJ *did* discuss the March 9, 2020 neurological evaluation with Dr. Umfleet, acknowledging that the plaintiff "reported persistent fatigue with difficulty sleeping and napping one and a half to two

22

hours per day." Dkt. No. 9-3 at 30, 33 (citing Dkt. No. 9-24 at 55–63). The ALJ noted, however, that the plaintiff "reported she did not take her Ritalin on the date of testing." Id. at 33; see dkt. no. 9-24 at 58. The ALJ summarized notes from a June 3, 2020 office visit during which the plaintiff "reported her fatigue was improved on methylphenidate" and "indicated she did not feel as tired anymore." Dkt. No. 9-3 at 31 (citing Dkt. No. 9-24 at 105). The ALJ pointed to records in which the plaintiff reported "difficulty sleeping," dkt. nos. 9-24 at 55–63, 9-28; Ex. 19F, and other records in which the plaintiff reported "improved sleep," dkt. nos. 9-32 at 13; 9-33 at 13; 9-26 at 46. Dkt. No. 9-3 at 32. And the ALJ acknowledged the plaintiff's hearing testimony that she took "one to three naps per day." Id. at 31 (citing Dkt. No. 9-28 at 6, 36 and plaintiff's hearing testimony). The ALJ rejected state agency consultant Dr. Turner's opinion that the plaintiff was capable of performing light work in part because "she reported *fatigue* and falls, indicating a further reduction to a range of sedentary work to be appropriate." Id. at 35 (emphasis added).

The plaintiff has not identified any evidence in the record that the ALJ did not consider or address, nor has the plaintiff shown that the ALJ erred in his consideration of the record evidence. The plaintiff's initial brief did not indicate what limitation or restriction the ALJ should have included in the RFC to account for the plaintiff's fatigue. In her reply brief, the plaintiff added that the only limitation the ALJ *had* included "that could remotely account for [this impairment was] maintaining attention and concentration for two-hour segments," but asserted that "[t]hat is a significant period of attention time for

23

anyone, let alone someone with severe fatigue, chronic insomnia, narcolepsy, incontinence, and a frequent need to urinate." Dkt. No. 21 at 8. The plaintiff then argued that "[d]ue to these limitations, both Doctor Andrew Schramm and Laura Umfleet noted the need for [the plaintiff] to take frequent breaks in controlled settings." Id. (citing Dkt. Nos. 9-24 at 55–62; 9-27 at 63–69). The court believes the plaintiff was referring to Dr. Schramm's and Dr. Umfleet's suggested *academic* accommodation that the plaintiff "should be allowed to take brief breaks during long classes to help with fatigue." Dkt. Nos. 9-24 at 59; 9-27 at 65. But neither Schramm nor Umfleet made recommendations for limitations in the workplace. Nor were their academic restriction recommendations specific; how long is a "brief" break? How often would the plaintiff need to take breaks in an eight-hour workday? How does a limitation to sedentary work fail to accommodate the plaintiff's fatigue?

Turning to her allegations of chronic insomnia and narcolepsy, the plaintiff states only that "[t]his is a severe abnormality that affects her ability to work, stay on task, and remain focused." Dkt. No. 10 at 18. The plaintiff asserts that the ALJ did not consider "[t]his severe impairment." Id. In support, the plaintiff points to records from a sleep lab visit on April 20, 2021. Id. (citing Dkt. No. 9-4 at 2–3). Earlier in the plaintiff's brief, in summarizing the case background and the record evidence, the plaintiff included a section on her chronic fatigue and insomnia. Id. at 10. This section cited additional evidence: notes from a February 15, 2021 "new sleep evaluation," dkt. no. 9-5 at 2–6, and April 20, 2021 results from a multiple sleep latency study, dkt. no. 9-4 at

24

2–3. None of these records were before the ALJ, so they cannot support the plaintiff's argument that a remand under sentence four is necessary.

### 3. *Intense and Chronic Pain*

The plaintiff argues that she "suffers from intense and chronic pain" and that her complaints of pain due to her conditions "are prevalent throughout her medical records." Dkt. No. 10 at 18 (citing Dkt. Nos. 9-4 at 33; 9-18 at 93). The first record the plaintiff cites was not available to the ALJ; the second is from a March 2019 visit, which occurred during the period for which the ALJ found the plaintiff was disabled. The plaintiff points to other records showing that she was "diagnosed with chronic and neurogenic pain that reaches levels of 10/10"[12] and reports that she currently undergoes "pain management, pain psychology treatment, biofeedback therapy" and "recurrent treatment." Id. (citing Dkt. No. 10-2 at 2–4, 10–12, 18–19). These records were not available to the ALJ, because they are dated after the March 1, 2021 hearing and the May 5, 2021 decision, so they cannot support the plaintiff's argument for remand under sentence four. The plaintiff also asserts that on April 12, 2021, she "presented to her primary care doctor with right sided pain" in her shoulder, leg and foot, and states that on April 16, 2021, she reported that "the pain was worsening, starting at the ball of her foot, and traveling up the right side of her body to the right arm and head." Dkt. No. 10 at 9 (citing Dkt. No. 10-1 at 18–

---

[12] At the hearing on August 10, 2023, the court stated that nowhere in the records the plaintiff cited could the court find a reference to her pain being a 10/10. The court erred in that statement; in a progress note from a January 7, 2022 visit, Dr. Schramm recounted a subjective statement by the plaintiff that "[p]ain severity reaches 10/10." Dkt. No.10-2 at 10.

20, 21–24). The plaintiff indicates that she submitted these records to the SSA on July 2, 2021, dkt. no. 10 at 9 n.6, which is almost two months after the ALJ issued his decision. See also Dkt. No. 9-3 at 3 (notice from Appeals Council listing records that plaintiff submitted to the Appeals Council). Again, these records were not available to the ALJ and cannot support remand under sentence four.

The plaintiff nevertheless argues that she testified to her "severe impairment"[13] of intense and chronic pain and that it was supported by the medical records, but that the ALJ never considered it. Dkt. No. 10 at 18 (citing Dkt. No. 9-5 at 30). The page of the hearing transcript that the plaintiff highlights contains the plaintiff's testimony about her pain in December 2019 and earlier. The relevant period for the plaintiff's appeal to this court is the period after March 9, 2020.

4.     *Incontinence and Frequent Need to Urinate*

The plaintiff alleges that the ALJ failed to consider her incontinence and frequent need to urinate. Dkt. No. 10 at 18 (citing Dkt. Nos. 9-27 at 37–41; 9-24 at 2). The plaintiff asserts that this is a "severe abnormality" that affects her self-esteem and ability to stay on-task and remain focused. Id. The plaintiff argues that the ALJ never considered this "severe impairment" and that he ignored the VE's testimony that someone who "leaves the workstation more

---

[13] Again, to the extent the plaintiff argues the ALJ should have found at step two that the plaintiff's pain was a severe impairment, any such error is harmless.

than four times a day would not be able to maintain a job." Id. (citing Dkt. No. 9-5 at 54).

The ALJ acknowledged that the plaintiff alleged urinary incontinence, but found that it was a non-severe impairment. Dkt. No. 9-3 at 21. The ALJ summarized the plaintiff's complaints of urinary incontinence, diagnosis of overactive bladder and treatment history:

> On June 30, 2020, the claimant sought treatment for urinary incontinence that developed progressively since November 2019. She reported the urinary incontinence occurred daily and she experienced the urge to urinate only seventy-five percent of the time. She reported she had experienced four events of gross incontinence and indicated she was going to the restroom about every half hour. She reported her sense of urgency was overwhelming and offered her little to no time in between her first sense of urgency to the overwhelming sensations. She was diagnosed with an overactive bladder. She was referred to pelvic floor physical therapy and she was provided samples of Myrbetriq and asked to return in three months. (Exhibit 15F/1, 5) The claimant reported pelvic floor weakness causing incontinence, pelvic pain, and constipation. The claimant underwent pelvic floor physical therapy from July 6, 2020 to December 8, 2020. The claimant was prescribed medication, including trospium, to treat her symptoms with significant improvement reported (Exhibits 15F; 20F/3).

Id. (citing Dkt. Nos. 9-27 at 37, 41; 9-34 at 5, 7). The ALJ also found that the record showed that the plaintiff's urinary incontinence was "controlled with medication." Id. (citing Dkt. No. 9-34 at 5, 7).

"When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment." Denton v. Astrue, 596 F.3d 419, 423 (7th Cir. 2010) (citing 20 C.F.R. §404.1523; Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009); Villano v. Astrue, 556 F.3d 558, 563 (7th Cir.

27

2009)). "A failure to fully consider the impact of non-severe impairments requires reversal." Id. (citing Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003)). The court cannot find that the ALJ failed to consider the plaintiff's urinary incontinence. The ALJ's decision included a detailed summary of the plaintiff's history with this impairment and found that the record demonstrated the plaintiff reported "significant improvement" and that the condition was controlled with medication, dkt. no. 9-34 at 5, 7, such that the ALJ found it unnecessary to include a specific restriction in the RFC, dkt. no. 9-3 at 21. See Brown, 799 F. App'x at 919 (stating that whether an impairment was "well-controlled is relevant to whether [the claimant] achieved medical improvement, because conditions that can be controlled with medication are not disabling") (citing Prochaska, 454 F.3d at 737).

The plaintiff's initial brief appears to suggest that the ALJ should have included a limitation in the RFC that the plaintiff would need to frequently leave her workstation: "In fact, the vocational expert stated that someone that leaves the workstation more than four times a day would not be able to maintain a job." Dkt. No. 10 at 18 (citing Dkt. No. 9-5 at 138). As previously noted, the plaintiff's reply brief added that the only limitation the ALJ included "that could remotely account for [this impairment was] maintaining attention and concentration for two-hour segments," but asserts that "[t]hat is a significant period of attention time for anyone, let alone someone with severe fatigue, chronic insomnia, narcolepsy, incontinence, and a frequent need to urinate." Dkt. No. 21 at 8. The plaintiff then argues that "[d]ue to these

limitations, both Doctor Andrew Schramm and Laura Umfleet noted the need for [the plaintiff] to take frequent breaks in controlled settings." Id. (citing Dkt. Nos. 9-24 at 55–62; 9-27 at 63–69). The records that the plaintiff cites, however, indicate that the plaintiff's academic accommodations should include an instruction that "she should be allowed to take brief breaks during long classes *to help with fatigue*." Dkt. Nos. 9-24 at 59; 9-27 at 65 (emphasis added). Neither Dr. Schramm nor Dr. Umfleet opined that the plaintiff required breaks to accommodate her urinary incontinence; neither opinion mentioned the plaintiff's urinary incontinence, likely because Drs. Schramm and Umfleet specialize in mental impairments, not physical. See also Dkt. No. 9-34 at 45–51 (Dr. Schramm's February 2021 opinion). The plaintiff points to no other medical opinion opining that the plaintiff required more breaks for her urinary incontinence than those typically allowed by employers in an eight-hour workday. Nor does the plaintiff point to record evidence demonstrating that the plaintiff's RFC required allowing her to leave the workstation more than four times a day.

### 5. *Medications*

The plaintiff's brief includes a separate subsection in which she implies that the ALJ failed to consider the side effects of the plaintiff's medications in the disability determination. See Dkt. No. 10 at 18–19 (stating that "[s]ide effects of medications should be considered in a disability determination"). The plaintiff indicates that she "takes a plethora of medications" and lists them: "She is on Sertraline for depression; Bupropion for Depression;

29

Methylphenidate to help with concentration; Trospium Chloride to help lessen urination; Xyrem to help with sleeping; Duloxetine HCI for nerve pain; Pregabalin for nerve pain; and carbamazepine to treat seizures and nerve pain." Dkt. No. 10 at 18.

The plaintiff provides no further argument on this issue and does not identify the side effects of these medications that she asserts the ALJ failed to consider or how these side effects affect her ability to work. The plaintiff cites a Seventh Circuit case, but does not provide a quote from or explanation of the case. Dkt. No. 10 at 19 (citing Flores v. Massanari, 19 F. App'x 393, 399–400 (7th Cir. 2001)). Perhaps the plaintiff intended to highlight the Seventh Circuit's statement that "[t]he side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process." Flores, 19 F. App'x at 399. This statement is true, but because the plaintiff has not identified the side effects, it is hard for them to figure into her disability determination process. The plaintiff also vaguely directs the court to "see also SSR 96-7p." Dkt. No. 10 at 19. This Social Security ruling involves the ALJ's credibility determination/subjective symptom analysis and states, in part, that when assessing the credibility of an individual's statements, ALJs must consider "the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms." SSR, 1996 WL 374186, at *3. The plaintiff's brief did not raise a challenge to the ALJ's subjective symptom analysis; and SSR 96-7p has been superseded by SSR 16-3p.

The court will not remand on this ground.

C.     Medical Opinion of Treating Provider Dr. Schramm

The plaintiff argues that the ALJ erred in finding the opinion of treating provider Dr. Andrew Schramm unpersuasive. Dkt. No. 10 at 19. The plaintiff asserts that the ALJ failed to give proper weight to Dr. Schramm's opinion because "[a] treating doctor's opinion regarding the nature and severity of a medical condition is entitled to 'controlling weight' if it is well supported by medical findings and is not inconsistent with other substantial evidence in the record." Id. (citing Brown v. Colvin, 845 F.3d 247 (7th Cir. 2016); SSR 96-2). The plaintiff also argues that the ALJ improperly disregarded Dr. Schramm's September 8, 2020 opinion "because it was drafted in the context of an academic setting." Id. at 19–20. Finally, the plaintiff asserts that the ALJ improperly disregarded Dr. Schramm's February 14, 2021 opinion. Id. at 20.

The plaintiff contends that Dr. Schramm's opinions are consistent with the entire medical record and that the ALJ erred in relying on Dr. Umfleet's neurological evaluation in finding Dr. Schramm's opinion unpersuasive. Dkt. No. 10 at 20. According to the plaintiff, "[f]inding Dr. Schramm unpersuasive as her treater of over two years is a significant abuse of discretion; especially when it is supported by other treating physicians and the recent diagnosis of narcolepsy and chronic pain." Id. at 21. The plaintiff asserts that "the ALJ undercut the treating physician opinion without proper justification as the record does not support giving limited weight to treating physicians." Id. (citations omitted).

31

The plaintiff's initial brief[14] incorrectly relies on the "treating physician rule," which states that ALJs generally will give more weight to medical opinions from the claimant's treating sources but applies only to claims filed *before* March 27, 2017. 20 C.F.R. §404.1527(c)(2). For claims filed on or after March 27, 2017, such as the plaintiff's, the rules in 20 C.F.R. §404.1520c govern how ALJs consider medical opinions. Under these newer regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §404.1520c(a). Rather, ALJs must consider the medical source provider's opinion "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." Id. The regulation also states that the most important factors to consider when evaluating the persuasiveness of a medical opinion are supportability and consistency. Id. And ALJs are required to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions" in the decision. 20 C.F.R. §404.1520c(b)(2). "Supportability addresses the extent to which the medical opinion is explained by the provider and supported by objective findings . . . [w]hereas consistency addresses the extent to which a medical opinion is consistent with the record evidence as a whole, including evidence from other medical and nonmedical sources." Wachholz v. Kijakazi,

---

[14] After the Commissioner's brief points out the error, the plaintiff's reply brief changes course and does try to make more appropriate arguments under 20 C.F.R. §404.1520c. Dkt. No. 21 at 4–7.

No. 20-CV-1412, 2022 WL 787932, at *4 (E.D. Wis. Mar. 15, 2022) (citations omitted).[15]

Dr. Schramm completed a "Disability Documentation Form" for Marquette University on September 8, 2020. Dkt. No. 9-27 at 63–66. The ALJ summarized Dr. Schramm's opinion and found it unpersuasive "because it largely concern[ed] limits and accommodations in an academic setting rather than a work environment." Dkt. No. 9-3 at 35. But the ALJ did not stop there; he explained that these opinions were not persuasive to the extent that they suggested the plaintiff had more than *moderate* limitations in her abilities to understand, remember and apply information; concentrate, persist or maintain pace; and adapt or manage herself. Id. at 35–36. The ALJ acknowledged that Dr. Schramm's recommended accommodations were supported by some evidence of continuing deficits in the plaintiff's processing speed, but found that the record also showed that the plaintiff "exhibited excellent memory with average or better general intellectual abilities, sustained attention and substantially improved reading comprehension." Id. at 35. The ALJ noted that the plaintiff "reported substantial improvement of her reading ability," that "diagnostic testing demonstrated substantial improvements" and that the plaintiff "reported an ability to drive, shop, prepare simple meals, and take her own medications with reminders." Id. The ALJ referred to his earlier discussion

---

[15] See also Stevens v. Kijakazi, No. 21-CV-270-SCD, 2022 WL 1000598, at *6 (E.D. Wis. Apr. 4, 2022) (explaining that "[t]he supportability factor focuses on what the source brought forth to support his or her findings" and "[t]he consistency factor . . . compares the source's findings to evidence from other sources").

of the plaintiff's mental impairments in which the ALJ cited records

demonstrating improvements:

> The claimant was able to name her medications and take them
> independently with the use of a pillbox, although she reported she
> occasionally forgot to take pills. She reported she was independent
> in her activities of daily living. She indicated she was able to prepare
> simple meals in a microwave, shop, and perform light housekeeping,
> including cleaning floors and vacuuming. She reported working
> puzzles regularly. (Exhibits 13F/14; 19F/78)
> The claimant continued with speech and language therapy.
> Treatment notes on March 10, 2020 indicated that the claimant
> reported she was able to complete multiple homework assignments,
> including rewriting a short paper and completing worksheets. She
> was able to follow through with assigned tasks. (Exhibit 13F/78) On
> July 7, 2020, the claimant . . .  was assessed with mild limitations
> at complex levels. She exhibited mild aphasia with semantically and
> phonologically based deficits with observed phonemic paraphasia on
> two occasions. She was assessed with mild deficits in executive
> function with the ability to comprehend written information with one
> hundred percent comprehension at a good rate of processing speed.
> She exhibited mild deficits in insight.
> . . . . .
> In October 2020, her therapist noted a decreased need for frequency
> of therapy (Exhibit 18F/30). The claimant was discharged from
> speech and language therapy on October 14, 2020.

Id. at 33 (citing Dkt. Nos. 9-26 at 15–16, 79; 9-28 at 31; 9-33 at 4).

"Section 404.1520c(c) requires ALJs to explicitly explain why particular

medical opinions are consistent with the record as a whole." Bakke v. Kijakazi,

62 F.4th 1061, 1067 (7th Cir. 2023) (citing 20 C.F.R. §404.1520c(b)(2), (c)(1)[16]).

The plaintiff did not argue in her initial brief that the ALJ failed to consider and

articulate consideration of the consistency factor in evaluating Dr. Schramm's

September 2020 opinion. The plaintiff's reply brief suggests such an argument

---

[16] This cite to subsection (c)(1) may be a typo, because subsection (c)(2) is the
consistency prong and (c)(1), as the order notes a few lines down, is the
supportability prong.

("Doctor Schramm's opinion is supported by the neuropsychological examination and consistent with the opinion of Doctor Laura Umfleet. 21 C.F.R. § 404.1520c."), dkt. no. 21 at 5, but "arguments raised for the first time in [a] reply brief are waived because they leave no chance to respond." White v. United States, 8 F.4th 547, 552 (7th Cir. 2021) (citing Wonsey v. City of Chicago, 940 F.3d 394, 398 (7th Cir. 2019); United States v. Vitrano, 747 F.3d 922, 925 (7th Cir. 2014)). Even had the plaintiff raised this argument in her initial brief, the ALJ's opinion demonstrates that he sufficiently considered and articulated his consideration of the consistency factor in evaluating Dr. Schramm's September 2020 opinion.

But §404.1520c also requires an ALJ "to consider the internal supportability of a . . . medical opinion." Bakke, 62 F.4th at 1068. As noted, supportability refers to the extent to which the medical opinion was explained by the provider and supported by objective findings. Again, the plaintiff did not properly raise this argument, but the court will address it. The court finds that the ALJ's decision did not articulate his consideration of the supportability factor in evaluating Dr. Schramm's September 2020 opinion. "Normally a failure to apply the correct legal standard requires [the court] to remand the case to the ALJ for further proceedings." Karr, 989 F.3d at 513 (citing Meuser v. Colvin, 838 F.3d 905, 912 (7th Cir. 2016)). But if the error leaves the court "convinced that the ALJ would reach the same result on remand, then the error is harmless and a remand is not required." Id. (citing Lambert v. Berryhill, 896 F.3d 768, 776 (7th Cir. 2018)). "In making this determination, we look to the

record to see 'if we can predict with great confidence what the result on remand will be.'" Id. (quoting McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011)).

Dr. Schramm's September 2020 opinion consisted of filling out Marquette's "Disability Documentation Form." Dkt. No. 9-27 at 63–66. Dr. Schramm listed the plaintiff's long-term disabilities, wrote that the plaintiff was substantially limited in her level of functioning, explained how her impairments impacted her ability to participate and learn in an academic setting and explained the treatments the plaintiff was undergoing. Id. at 63–64. Dr. Schramm then provided a list of suggested accommodations. Id. at 65. Dr. Schramm did not include an explanation of his findings and recommended accommodations, nor identify any objective findings supporting them. The only portion that could slightly suggest internal supportability is where Dr. Schramm answered the question of whether he could "affirm that the student continues to meet the diagnosis criteria [of] the condition" by checking the "yes" box and indicating that he had an ongoing treatment relationship with the plaintiff. Id. at 63. The court can predict with great confidence that even if the ALJ articulated these shortcomings in the internal supportability of Dr. Schramm's September 2020 opinion, the ALJ would reach the same result on remand (i.e., find the opinion unpersuasive), rendering the error harmless.

As to the plaintiff's specific argument that the ALJ improperly found Dr. Schramm's opinion less persuasive because it focused on limitations in an *academic* setting, the Commissioner argues that the plaintiff provides no evidence or authority to support that an academic setting is similar to a work

36

setting. Dkt. No. 17 at 19 (citing Dkt. No. 10 at 20). The Commissioner also points out that the definition of "disability" on the academic accommodation form Dr. Schramm completed is not the same as the definition of "disability" used in Social Security cases. Id. (citing Dkt. No. 9-27 at 64).[17] In response, the plaintiff argues that the Commissioner's brief "spends great time criticizing the [plaintiff] for failing to cite evidence" of the similarities between academic and work settings, "yet ignores the ALJ's failure to do so." Dkt. No. 21 at 5. The plaintiff asserts that the ALJ did "not cite to evidence for the proposition that an academic setting, albeit a very limited and accommodating academic setting, has no relationship to a work setting." Id. But even the plaintiff acknowledged in her initial brief that an academic setting and a work setting are not the same, conceding that an academic setting has "more freedom and reduced dependance on interpersonal skills." Dkt. No. 10 at 20.

Further, in finding Dr. Schramm's September 2020 opinion unpersuasive, the ALJ did not rely solely on the observation that the opinion "largely concern[ed] limits and accommodations in an academic setting rather than a work environment." Dkt. No. 9-3 at 35. The ALJ continued with the analysis, concluding that this opinion was not consistent with the record to the extent that it suggested the plaintiff had more than only moderate limitations

---

[17] Marquette's form defines "disability" as "a mental health or medical condition that substantially limits one or more major life activities." Dkt. No. 9-27 at 64. The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A).

in her mental abilities. Id. at 35–36. Contrary to the plaintiff's assertion in her

reply brief, this opinion was not "summarily disregarded by the ALJ." Dkt. No.

21 at 4. If there was error, it was harmless because the ALJ's finding that Dr.

Schramm's September 2020 was not persuasive was otherwise sufficiently

supported.

Dr. Schramm also filled out a "Mental Medical Opinion" form dated

February 15, 2021 and attached a treatment summary bearing the same date.

Dkt. No. 9-34 at 45–51. The ALJ provided this summary of Dr. Schramm's

opinions:

> As for Dr. Schramm's February 2021 opinion, he opined that the
> claimant's mental abilities and aptitudes needed to do unskilled
> work ranged from unlimited or very good to no useful ability to
> function. For example, Dr. Schramm opined that the claimant had
> no useful ability to function in maintaining attention for two-hour
> segments.

Dkt. No. 9-3 at 36. The ALJ found Dr. Schramm's February 2021 opinion

unpersuasive because it was not consistent with the evidence from that period.

Id. Relying on the March 2020 neuropsychological exam, the ALJ

acknowledged that these results "showed some weaknesses in aspects of

language, but also indicated" that the plaintiff's "reading rate and

comprehension had improved to low average." Id. (citing Dkt. No. 9-24 at 55–

63). The ALJ also noted that the March 2020 exam showed that the plaintiff

"had intact abilities including excellent memory, average or better general

intellectual abilities, and sustained attention." Id. (citing Dkt. No. 9-24 at 55–

63). And, as the court previously noted, the ALJ's decision included a detailed

discussion of the plaintiff's mental impairments and treatment records after

38

March 9, 2020, several of which demonstrated improvements in the plaintiff's mental abilities. See Dkt. No. 9-3 at 32–34. A reviewing court examines an ALJ's opinion as a whole; the court will "not discount [information] simply because it appears elsewhere in the decision." Curvin, 778 F.3d at 650. "To require the ALJ to repeat such a discussion throughout h[er] decision would be redundant." Id.

It is true that "[t]he key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." Murphy v. Colvin, 759 F.3d 811, 819 (7th Cir. 2014). But although the ALJ found Dr. Schramm's opinion unpersuasive, he did not conclude that the plaintiff had improved to the point of having *no* limitations to her mental abilities. The ALJ found that the record did not support *the extent* to which Dr. Schramm opined the plaintiff was impaired; the ALJ disagreed with Dr. Schramm's opinions "to the extent they suggest[ed] more than moderate limitations in [the plaintiff's] abilities to understand, remember and apply information, concentrate, persist or maintain pace, and adapt or manage herself." Dkt. No. 9-3 at 36. The ALJ explicitly acknowledged that the record contained "some evidence" that the plaintiff experienced "continuing deficits in her processing speed," that the plaintiff's "attempt to return to law school was ultimately unsuccessful" and that the March 2020 neuropsychological evaluation "showed some weakness in aspects of language." Id. But the ALJ found that the record also showed that the plaintiff had "greater mental abilities than those opined by Dr. Schramm," id. at 36, and

39

had only "moderate limitations of her abilities to understand, remember and apply information, concentrate, persist or maintain pace, and adapt and manage" herself, id. at 35. See also id. at 28–30 (discussing and finding that after March 9, 2020, the plaintiff had moderate limitations in these three areas of mental functioning).

The ALJ's decision demonstrates that he considered and articulated his consideration of the consistency factor, *i.e.*, the extent to which a medical opinion is consistent with the record evidence as a whole. As with Dr. Schramm's September 2020 opinion, however, the ALJ's decision did not articulate the ALJ's consideration of the supportability factor in evaluating Dr. Schramm's February 2021 opinion. Again, the plaintiff's initial brief did not raise the argument that the ALJ erred in failing to articulate consideration of the supportability factor. In her reply brief, the plaintiff does seem to argue that Dr. Schramm cited the basis for his opinion in the letter that accompanied his February 2021 opinion: "Specifically, that he has seen [the plaintiff] 37 times over the last three years. (Dkt. No. 9-34, 22F, 2724. He also discussed how she would feel distressed due to her inability to perform job responsibilities which would likely increase the severity of her depression. *Id.*" Dkt. No. 21 at 5-6. As the court has noted, the plaintiff waived this argument by raising it for the first time in a reply brief.

Even had the plaintiff raised supportability in her initial brief, any failure by the ALJ to articulate consideration of the supportability factor in evaluating Dr. Schramm's February 2021 opinion is harmless error. Dr. Schramm

completed a "Mental Medical Opinion" form listing the conditions and impairments the plaintiff's impairments, as well as his opinion as to her abilities and recommended limitations. Dkt. No. 9-34 at 45–50. In this form portion of the February 2021 opinion, Dr. Schramm did not include an explanation of these findings and restrictions, nor any objective findings supporting them. Id. Dr. Schramm did attach a summary which hinted at internal supportability by explaining that he had seen the plaintiff "for individual psychotherapy" for a total of thirty-seven sessions beginning on September 5, 2019, and that their next appointment was scheduled for February 26, 2021. Id. at 51. The court can predict with great confidence that even if the ALJ articulated these shortcomings in the internal supportability of Dr. Schramm's February 2021 opinion, the ALJ would reach the same result on remand (i.e., find the opinion unpersuasive) and the error is thus harmless.

Finally, as the court has previously acknowledged, upon realizing her mistake regarding the applicable section of the regulations, the plaintiff's reply brief added arguments relevant to other factors in 20 C.F.R. §404.1520c. Dkt. No. 21 at 4. The plaintiff asserts that "Doctor Schramm has a PhD in behavioral health and is an Assistant Professor in the Department of Surgery, Division of Trauma & Acute Care Surgery at the Medical College of Wisconsin." Id. This appears to be an attempt to invoke the "specialization" factor in §404.1520c(c)(4).[18] The plaintiff also asserts that Dr. Schramm has been her

---

[18] In support, the plaintiff cites 21 C.F.R. §404.1520c and does not include a subsection. The court believes this is a typo and that the plaintiff meant to cite 20 C.F.R. §404.1520c.

"treating physician since September 2019" and has "treated Mrs. Thomas religiously over the course of three years." Id. (citing Dkt. Nos. 9-19 at 29–30; 9-34 at 51). This invokes the "relationship with the claimant" factor, which combines consideration of issues such as the length of the treatment relationship, the frequency of examinations and the examining relationship.[19] 20 C.F.R. §404.1520c(c)(3). Again, the plaintiff waived these arguments by raising them for the first time in a reply brief, but even had she properly raised the arguments in her initial brief, there would not be a basis for remand. Although the plaintiff is correct that these are also factors ALJs will consider when evaluating medical opinions, they are not as important as supportability and consistency. §404.1520c(a), (b)(2). The regulation states that ALJs "may, but are not required to, explain how" they considered these additional factors. Id. at §404.1520c(b)(2). See also Albert v. Kijakazi, 34 F.4th 611, 614 (7th Cir. 2022) (same). It is not reversible error for the ALJ to omit articulation of these factors in the decision.

Courts "do not review medical opinions independently but rather review the ALJ's weighing of those opinions for substantial evidence, and [courts] only overturn that weighing if no reasonable mind could accept the ALJ's conclusion." Grotts v. Kijakazi, 27 F.4th 1273, 1278 (7th Cir. 2022). "An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." Fanta v. Saul, 848 F.

---

[19] Again, the plaintiff cited 21 C.F.R. §404.1520c and refers to the "length of relationship for a longitudinal understand of impairments [as] an important factor."

42

App'x 655, 658 (7th Cir. 2021) (citing 20 C.F.R. §404.1527(d)(2); Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007)). "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Schmidt, 496 F.3d at 845 (citing Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995)). The ALJ's consideration of Dr. Schramm's opinions and his findings that they were unpersuasive were supported by substantial evidence. To the extent that the ALJ erred in failing to articulate his consideration of the supportability factor as required by 20 C.F.R. §404.1520c(c)(1), such error is harmless and remand is not required.

The plaintiff adds a final argument that "[a]t a very minimum, the ALJ should have re-contacted Doctor Schramm for clarification." Dkt. No. 10 at 21–22 (citing Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); SSR 96–2p at 4[20]). The plaintiff asserts that "[t]o completely disregard the medical report given to Marquette because it was to determine if she could complete one law school class (which she couldn't) and say it doesn't apply to work is an abuse of discretion." Id. at 22 (citing Barnett v. Barnhart, 381 F.3d 664, 669–70 (7th Cir. 2004); Smolen, 80 F.3d at 1288).

The court construes this as an argument that the ALJ failed to develop the record. "[T]he ALJ in a Social Security hearing has a duty to develop a full and fair record." Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009)

---

[20] As the Commissioner points out, SSR 96-2p was rescinded in 2017. Dkt. No. 17 at 19.

(citations omitted). But ALJs are only "required to make a 'reasonable effort' to ensure that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination." Martin v. Astrue, 345 F. App'x 197, 201–02 (7th Cir. 2009) (citing 20 C.F.R. §§416.912(d), 416.927(c)(3); SSR 96–8p; Skinner v. Astrue, 478 F.3d 836, 843–44 (7th Cir. 2007)). The Seventh Circuit "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather . . . [a]nd an omission is significant only if it is prejudicial." Nelms, 553 F.3d at 1098 (citations omitted). The fact that the ALJ did not re-contact Schramm for "clarification" is not a "significant omission" requiring remand. Ferguson v. Barnhart, 67 F. App'x 360, 367 (7th Cir. 2003); Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997). And although "the ALJ bears some responsibility for the development of the record . . . at the same time the ALJ is entitled to assume that a claimant represented by counsel is making [her] strongest case for benefits." Nicholson v. Astrue, 341 F. App'x 248, 253 (7th Cir. 2009) (internal quotations and citations omitted). The fact that the ALJ did not re-contact Doctor Schramm is not reversible error.

The court will not remand on this ground.

D.     Severity Level of the Plaintiff's Mental Impairments

The plaintiff's brief argues that she has *extreme* difficulties in concentrating, persisting and maintaining pace; understanding, remembering and applying information; and adapting or managing herself. Dkt. No. 10 at 22. See also id. at 24 (stating that the plaintiff "argues that the medical records,

44

treating physician diagnoses, and testimony of [the plaintiff] support the finding that these limitations were in fact severe and not moderate"). In support, the plaintiff points to her March 2020 neuropsychological evaluation that "showed her sentences were somewhat difficult to follow due to dysgraphia" and her "reading level was low average." Id. at 22. The plaintiff also relies heavily on the opinions of Dr. Schramm:

> He reported that she has memory problems, dyslexia, sustained attention difficulties, and problems retaining information. He further concluded that she has clinically significant symptoms of depression that have limited response to medication; that she has word finding difficulties; inattention; and that she would not be able to sustain successful employment.
> . . .
> Dr. Schramm further found that she has significant word finding issues, slowed processing speed, lethargy, and attention deficits. Id. With further specificity, his opinion is that she has significant cognitive decline, qualitative defects in verbal communication, significant difficulties learning and using academic skills, easily fatigued, difficulty concentrating, feelings of guilt and worthlessness, and thoughts of death or suicide. Id. Based on his medical opinion, she is unable to make simple work-related decisions, complete a normal workday or work week without interruptions, perform at a persistent rate without unreasonable number and length of rest periods, or deal with normal stress, in even unskilled work positions. Id. Dr. Schramm, having treated [the plaintiff] regularly, concluded that she has clinically significant symptoms due to her stroke that would severely interfere with her ability to sustain successful employment. Id.

Id. at 22–23 (citing Dkt. No. 9-34 at 45–51).

The plaintiff also highlights her hearing testimony demonstrating that she "is not dependent"[21]:

---

[21] The court suspects the plaintiff meant to argue that she is not "*in*dependent."

She is severely depressed and the hearing testimony showed that she takes her [sic] over an hour to get out of bed in order to gather energy; prepare for pain; and warm up her right side. It takes her 45 minutes to an hour to complete a seated shower. It takes her an additional 45 minutes to an hour to dress and brush her teeth. She then requires a nap before she can either eat the breakfast prepared by her spouse or grab an RX bar. (Dkt. No. 9-5. pg. 120). Her fatigue is supported by her medical records which show that she suffers from chronic fatigue, insomnia—all not considered by the ALJ. She then is required to rest again after breakfast. It is difficult and timely for her to make it through a morning routine, let alone get to work on time, and have a productive workday.

Dkt. No. 10 at 23 (citing Dkt. No. 9-5 at 36).

The ALJ found that the plaintiff had *moderate* limitations in understanding, remembering or applying information; concentrating, persisting or maintaining pace; and adapting or managing herself. Dkt. No. 9-3 at 29–30. The ALJ's decision included detailed paragraphs for each of these areas of mental functioning. In understanding, remembering and applying information, the ALJ acknowledged the plaintiff's reports of "difficulty remembering generally, following instructions, and paying bills," but observed that the plaintiff "also stated that she could perform simple maintenance, prepare meals, go to doctor's appointments, and take medications." Id. at 29 (citing Dkt. Nos. 9-10 at 2–4, 6–27, 31–39, 42–49, 53–57; 9-11 at 9–15; plaintiff's hearing testimony). The ALJ acknowledged that "[a]bnormal findings on mental status examinations showed [the plaintiff] exhibited tangential thought processes and variable memory," and that the March 2020 neuropsychological evaluation demonstrated the plaintiff's continuing difficulties with dysgraphia. Id. But the ALJ observed that the March 2020 exam also "showed improvement in her cognitive abilities": "The claimant showed improved auditory

46

comprehension, reading comprehension, vocabulary, and improved attention with less paraphasias. She improved to low average reading comprehension. She exhibited excellent memory with average or better general intellectual abilities." Id. (citing Dkt. Nos. 9-24 at 55–63; 9-26 at 37; 9-28 at 3, 10; 9-30 at 8, 15–16; 9-31 at 15–16; 9-33 at 13; 9-34 at 7, 40).

In concentration, persistence and pace, the ALJ recounted that the plaintiff alleged "limitations in concentrating generally" but also reported being "able to read and manage funds." Dkt. No. 9-3 at 29 (citing Dkt. Nos. 9-10 at 2–4, 6–27, 31–39, 42–49, 53–57; 9-11 at 9–15; plaintiff's hearing testimony). The ALJ again observed that abnormal findings from mental status exams showed that the plaintiff "exhibited slightly tangential thought processes and variable memory," that the plaintiff's "sentences were somewhat difficult to follow due to dysgraphia" and that the plaintiff's "ability to converse was clearly stronger than her ability to put her thoughts together via writing." Id. And the ALJ summarized the improvements reflected in the record: "The claimant showed improved auditory comprehension, reading comprehension, vocabulary, and improved attention. She improved to low average reading comprehension. She exhibited excellent memory, average or better general intellectual abilities, and sustained attention. She exhibited variable processing speed with speed compromised for accuracy." Id. (citing Dkt. Nos. 9-24 at 55–63; 9-26 at 37; 9-28 at 3, 10; 9-30 at 8, 15–16; 9-31 at 15–16; 9-33 at 13; 9-34 at 7, 40).

In adapting and managing herself, the ALJ summarized the plaintiff's reports "that she has difficulties handling change," but "that she is able to

47

handle self-care and personal hygiene and care for her cats." Dkt. No. 9-3 at 30 (citing Dkt. Nos. 9-10 at 2–4, 6–27, 31–39, 42–49, 53–57; 9-11 at 9–15; plaintiff's hearing testimony). The ALJ acknowledged that "[a]bnormal findings on mental status examinations showed [the plaintiff] exhibited dysphoric mood, tangential thought processes, variable memory, and speech deficits with continued depression and anxiety." Id. But the ALJ recounted that the record revealed positive findings: "However, she exhibited excellent memory, average or better general intellectual abilities, and sustained attention. She exhibited variable processing speed with speed compromised for accuracy. Mental status examinations also showed she exhibited an appropriate or positive mood and affect with good grooming and normal judgment." Id. (citing Dkt. Nos. 9-26 at 37; 9-28 at 3; 9-30 at 16; 9-31 at 15–16; 9-33 at 13).

The ALJ's decision provided additional discussion of the plaintiff's reported complaints of depression, anxiety and adjustment issues:

> Regarding the claimant's mental impairments, the record indicates the claimant complained of depression, anxiety, and adjustment issues with difficulty sleeping (See e.g. Exhibits 8F; 18F; 19F). Mental status examination showed she was alert and cooperative. She exhibited an appropriate or positive mood and affect with good grooming, and normal judgment (Exhibits 18F/9; 19F/33; 20F/3; 21F/4). She reported decreased anxiety with continued depression (Exhibit 19F/26). Abnormal findings on mental status examinations showed she exhibited dysphoric mood, slightly tangential thought processes, variable memory, and speech deficits (Exhibits 13F/36; 18F/2; 19F/34, 52-53, 87). On June 3, 2020, the claimant reported her depression was stable (Exhibit 11F/5). The record indicates the claimant reported improved mood, improved sleep, and occasional sadness (Exhibits 9F/68, 87; 13F/45). She exhibited improved mood (Exhibit 13F/48). The claimant arrived on time and for her scheduled appointments. (Exhibit 8F; 19F). The claimant was prescribed bupropion, Zoloft, Ritalin, and Trazodone (Exhibit 19F/1, 27).

48

Dkt. No. 9-3 at 32–33. The ALJ then provided a detailed summary of the March 9, 2020 neurological evaluation conducted by Dr. Umfleet, acknowledging that the evaluation revealed both abnormal findings and improvements:

> She reported she did not take her Ritalin on the date of testing. She indicated she wanted to take classes at Marquette Law School starting in the fall. She reported she drove herself all over with no problems (Exhibit 8F/2). Examination showed she exhibited persistent weaknesses that continued to be consistent with phonological dyslexia and dysgraphia secondary to her stroke. She exhibited significant weaknesses with writing (dysgraphia) and reading (dyslexia). The claimant reported persistent fatigue with difficulty sleeping and napping one and a half to two hours per day. Her sentences were somewhat difficult to follow due to dysgraphia. The claimant's ability to converse was clearly stronger than her ability to put her thoughts together via writing. She indicated that on a test of fine motor dexterity, her right hand continued to be weaker than her left with pain increased on her right side. The completed evaluation showed improvement in her cognitive abilities. The claimant showed improved auditory comprehension, reading comprehension, vocabulary, less paraphasias, and improved attention. She improved from borderline impaired in 2018 to low average reading comprehension. She exhibited excellent memory, average or better general intellectual abilities, and sustained attention. She exhibited variable processing speed with speed compromised for accuracy. (Exhibit 8F)

Id. at 33 (citing Dkt. No. 9-24 at 55–63). And the ALJ noted the plaintiff's reports to treating providers regarding her levels of function:

> The claimant was able to name her medications and take them independently with the use of a pillbox, although she reported she occasionally forgot to take pills. She reported she was independent in her activities of daily living. She indicated she was able to prepare simple meals in a microwave, shop, and perform light housekeeping, including cleaning floors and vacuuming. She reported working puzzles regularly.

Id. (citing Dkt. Nos. 9-26 at 15; 9-33 at 4).

Finally, the ALJ included a thorough summary of the plaintiff's speech and language therapy history:

49

Treatment notes on March 10, 2020 indicated that the claimant reported she was able to complete multiple homework assignments, including rewriting a short paper and completing worksheets. She was able to follow through with assigned tasks. (Exhibit 13F/78) On July 7, 2020, the claimant reported she had been reading novels, up to three at a given time, because she was bored or not in the mood for a particular topic. She was assessed with mild limitations at complex levels. She exhibited mild aphasia with semantically and phonologically based deficits with observed phonemic paraphasia on two occasions. She was assessed with mild deficits in executive function with the ability to comprehend written information with one hundred percent comprehension at a good rate of processing speed. She exhibited mild deficits in insight. The therapist noted the claimant often did homework she liked, but postponed more challenging tasks like lengthy writing and she completed only portions of the phonological component analysis tasks. (Exhibit 13F/15)

. . .

In October 2020, her therapist noted a decreased need for frequency of therapy (Exhibit 18F/30). The claimant was discharged from speech and language therapy on October 14, 2020. She reported she performed better on her law school midterm than expected and she was given thirty minutes extra to complete the exam. She reported that her husband helped her type her answers. She had thirty minutes left to revise her answers and she was able to do so without assistance. (Exhibit 19F/33) In November 2020, the claimant reported she had to drop her class on the recommendation of the dean, as she was unable to keep up with the demands of the class. (Exhibits 13F/2; 18F/2, 5, 35)

Dkt. No. 9-3 at 33–34.

The ALJ also considered the opinions of the state agency consultants at the initial (Dr. Donahoo) and reconsideration (Dr. Warren) levels who "assessed the claimant with nonsevere mental limitations with no limitation of her ability to interact with others and *mild* limitation of all other broad mental functioning areas." Dkt. No. 9-3 at 25, 35 (emphasis added) (citing Dkt. No. 9-6 at 3 –13, 15–27). The ALJ found these assessments unpersuasive because, as the ALJ's decision previously explained, "the medical evidence reviewed and the

50

longitudinal evidence supported *moderate* limitations of her abilities to understand, remember and apply information, concentrate, persist or maintain pace, and adapt and manage oneself . . . ." Id. (emphasis added). In other words, based on the evidence in the record, the ALJ imposed *greater* limitations than those opined by the state agency consultants.

The plaintiff has not identified any evidence that the ALJ ignored or failed to discuss regarding her mental impairments. The plaintiff has not shown that the ALJ's findings lacked substantial evidence or that the ALJ failed to build an accurate and logical bridge between the record evidence and his conclusions that the plaintiff had moderate impairments in her abilities to understand, remember and apply information; concentrate, persist and maintain pace; and adapt or manage herself. Clifford, 227 F.3d at 872. The plaintiff has not pointed to any portions of the record demonstrating that she had severe rather than moderate limitations in the areas of mental functioning beyond Dr. Schramm's opinion and the plaintiff's hearing testimony.

The plaintiff's reliance on Dr. Schramm's opinions is unpersuasive. Dr. Schramm opined that the plaintiff was "seriously limited" in her ability to remember work-like procedures, understand and remember very short and simple instructions, carry out very short and simple instructions, maintain regular attendance and be punctual and carry out detailed instructions. Dkt. No. 9-34 at 47, 48. Dr. Schramm also opined that the plaintiff was "unable to meet competitive standards" in her ability to make simple work-related decisions, complete a normal workday and workweek without interruptions

from psychologically based symptoms, deal with normal work stress, perform at a consistent pace without an unreasonable number and length of rest periods and understand and remember detailed instructions. Id. at 47, 48. And Dr. Schramm opined that the plaintiff had "no useful ability to function" in maintaining attention for two-hour segments. Id. at 47. See also id. at 45 (stating the plaintiff had "significant word-finding issues, slowed processing speed" and "attention deficits"); id. at 48 (stating the plaintiff had "significant cognitive deficits due to stroke"); id. at 51 ("[h]er attention deficits, due to stroke, have persisted despite being prescribed medication for inattention. In session, she often has wordfinding difficulties. She is easily distracted and loses her train of thought frequently. These deficits would severely interfere with her ability to sustain successful employment."). The court has concluded that the ALJ did not err in finding Dr. Schramm's opinions unpersuasive and substantial evidence supported the ALJ's finding that the record did not support these greater limitations in mental abilities opined by Dr. Schramm. Dkt. No. 9-3 at 35–36.

It is true that the plaintiff testified at the hearing about her difficulties with her mental and emotional abilities, dkt. no. 9-5 at 31–36, as well as what a typical day was like, id. at 36–38. The only testimony the plaintiff gave regarding changes with her "mental abilities since the beginning of 2020," however, was that she "can express more in . . . therapy" but she forgets to write things down so she can remember to talk about them in therapy. Id. at 36. The testimony the plaintiff highlights involved a typical day for the plaintiff

52

in December of 2018. Dkt. No. 10 at 23 (citing Dkt. No. 9-5 at 36). The plaintiff's appeal to this court involves the ALJ's decision that the plaintiff improved and was not disabled after March 9, 2020. And ultimately, "an ALJ need only include limitations that are supported by the medical record." Reynolds v. Kijakazi, 25 F.4th 470, 473 (7th Cir. 2022). Even if the plaintiff's testimony had permitted the ALJ to impose greater limitations, "there is nothing that compels them." Delong v. Saul, 844 F. App'x 894, 900 (7th Cir. 2021).

"An ALJ has 'final responsibility' for determining a claimant's residual functional capacity and need not adopt any one doctor's opinion." Fanta, 848 F. App'x at 658 (citing 20 C.F.R. §404.1527(d)(2); Schmidt, 496 F.3d at 845). "[A]n ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Schmidt, 496 F.3d at 845 (citing Diaz, 55 F.3d at 306 n.2). The ALJ's decision included a thorough and detailed discussion of the plaintiff's mental impairments and abilities. See Dkt. No. 9-3 at 28–30, 32–34. The ALJ found that the plaintiff had a mild limitation in her ability to interact with others and moderate limitations in her abilities to understand, remember or apply information; to concentrate, persist or maintain pace; and to adapt or manage herself. Id. at 29–30. The ALJ found that the record evidence required greater restrictions than the mild and no limitations assessed by the state agency consultants, id. at 34–35, but that the

record did not support the greater limitations in the areas of mental functioning suggested by Dr. Schramm, id. at 35–36.

The plaintiff has not identified error in the ALJ's assessment of the plaintiff's mental impairments and has not highlighted any record evidence that the ALJ did not consider or that demonstrates the plaintiff had more than moderate limitations in her mental abilities. The court will not remand on this ground.

E.    ALJ's Limitation to Simple and Routine Tasks Was Insufficient to Address Mental Limitations

The plaintiff argues that the ALJ erred in concluding that limiting the plaintiff to performing "simple and routine tasks" was sufficient to accommodate the plaintiff's moderate limitations in understanding, remembering and applying information; concentration, persistence and pace; and adapting and managing herself. Dkt. No. 10 at 24. The plaintiff contends that it is "well-established precedent that limiting a claimant to 'simple and routine' tasks does not adequately account for limitations in understanding, remembering, and applying information or limitations in concentration, persistence, and pace." Id. (citing O'Connor-Spinner v. Astrue, 627 F.3d 614, 618–19 (7th Cir. 2010); Craft v. Astrue, 539 F.3d 668, 677–78 (7th Cir. 2008)). The plaintiff asserts that here, "the ALJ did exactly what our 7th Circuit has repeatedly rejected—substituted limitations in understanding, remembering, and applying information with 'simple and routine' tasks." Id. The plaintiff argues that "there was no authority to support the ALJ's speculation that eliminating jobs that are not limited to simple and routine tasks may serve as a

54

proxy for including, as part of [the plaintiff's RFC], a moderate limitation in understanding, remembering, and applying information and a moderate limitation in concentration, persistence, and pace." Id. at 24–25 (citing O'Connor-Spinner v. Colvin, 832 F.3d 690, 698 (7th Cir. 2016); Hunt v. Astrue, 889 F. Supp. 2d 1129, 1148–49 (E.D. Wis. 2012)).

The Commissioner points out that the line of cases on which the plaintiff relies (O'Connor-Spinner, Craft and Hunt) involve only the "concentration, persistence and pace" area of mental functioning, not the other paragraph B categories. Dkt. No. 17 at 23. The plaintiff's reply brief appears to concede this, asserting that nevertheless, "it is reversable error to use simple and routine tasks as a proxy for moderate limitations in concentration, persistence, and pace," as the ALJ did here. Dkt. No. 21 at 10 (citing Culver v. Saul, No. 19-CV-1810, 2021 WL 2936310, at *3 (E.D. Wis. 2021)).

Seventh Circuit case law does instruct that in crafting an RFC, "the ALJ generally may not rely merely on catch-all terms like 'simple, repetitive tasks' because there is no basis to conclude that they account for problems of concentration, persistence or pace." Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019) (quoting Winsted v. Berryhill, 923 F.3d 472, 477 (7th Cir. 2019); O'Connor-Spinner, 627 F.3d at 620). See also Bruno v. Saul, 817 F. App'x 238, 242 (7th Cir. 2020) (citing Crump and noting the Seventh Circuit has often "frowned at the notion that restriction to simple tasks adequately accommodates moderate CPP limitations"). The Seventh Circuit has observed that "the relative difficulty of a specific job assignment does not necessarily

correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace." Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020). "A task can be simple, but a person with a poor attention span may still become distracted and stop working." Mischler v. Berryhill, 766 F. App'x 369, 376 (7th Cir. 2019). See also Martin, 950 F.3d at 374 ("[S]omeone with problems concentrating may not be able to complete a task consistently over the course of a workday, no matter how simple it may be."). "The law does not require ALJs to use certain words, or to refrain from using others, to describe the pace at which a claimant is able to work." Martin, 950 F.3d at 374. But "the ALJ must account for the 'totality of a claimant's limitations' in determining the proper RFC." Id. (citing Moreno v. Berryhill, 882 F.3d 722, 730 (7th Cir. 2018)).

But the appellate court also has recognized that Crump teaches only that restriction to simple, repetitive tasks is "generally" not sufficient and cautions that such generic restrictions might not adequately capture a claimant's limitations. Bruno, 817 F. App'x at 242. There is no bright line rule that using the phrase "simple, repetitive tasks" in an RFC is automatically cause for remand. The real concern arises when "the restriction is used as a one-size-fits-all solution without delving into an individualized assessment of the claimant's specific symptoms." Id. (citing Martin, 950 F.3d at 373–74).

In Bruno, the Seventh Circuit found no reversible error because the record contained a specific finding that the claimant struggled to concentrate only when the assignment was complex, and a restriction to simple tasks was

56

thus appropriate. Bruno, 817 F. App'x at 242. In Jozefyk, the court noted the ALJ's RFC was sufficient because it "adequately account[ed] for the claimant's demonstrated psychological symptoms." Jozefyk v. Berryhill, 923 F.3d 492, 497–98 (7th Cir. 2019). And in Urbanek, the court acknowledged that "[e]ven generic limitations, such as limiting a claimant to simple, repetitive tasks, may properly account for moderate limitations in concentration, persistence, and pace, so long as they 'adequately account for the claimant's demonstrated psychological symptoms' found in the record." Urbanek v. Saul, 796 F. App'x 910, 914 (7th Cir. 2019) (quoting Jozefyk, 923 F.3d at 498).[22]

Limiting the plaintiff to performing "simple and routine tasks" was not the only restriction the ALJ included in the RFC to account for the plaintiff's mental impairments. The ALJ also limited the plaintiff "to communicating simple information" and "writing and typing simple and brief sentences," and found that the plaintiff could only "maintain attention and concentration for two-hour segments," "make simple work-related decisions" and "tolerate occasional changes in a routine work setting." Dkt. No. 9-3 at 31. These restrictions go beyond the "generic restrictions" against which the Seventh Circuit has cautioned and demonstrates an "individualized assessment of the [plaintiff's] specific symptoms." And "there is only so much specificity possible in crafting an RFC." Martin, 950 F.3d at 374.

---

[22] See also Pavlicek v. Saul, 994 F.3d 777, 784 (7th Cir. 2021); Pytlewski v. Saul, 791 F. App'x 611, 616 (7th Cir. 2019); Dudley v. Berryhill, 773 F. App'x 838, 842 (7th Cir. 2019); Saunders v. Saul, 777 F. App'x 821, 825 (7th Cir. 2019).

The plaintiff asserts that "these are hardly limitations" and that "these limitations are arbitrary and state nothing about meeting productivity standards." Dkt. No. 21 at 10. The plaintiff provides no support or authority for these bald assertions, nor does the plaintiff explain how these limitations are arbitrary or insufficient to address the plaintiff's mental impairments as demonstrated by the record. And as the Commissioner points out, the plaintiff does not hypothesize what kinds of work restrictions the ALJ should have included to account for the plaintiff's limitations in concentration, persistence and pace. See Jozefyk, 923 F.3d at 498 ("It is unclear what kinds of work restrictions might address Jozefyk's limitations in concentration, persistence, or pace because he hypothesizes none."). The plaintiff did not cite any record evidence showing that the moderate limitation in concentration, persistence and pace found by the ALJ precludes the plaintiff from performing simple and routine tasks, and "there are no [additional] evidence-based restrictions that the ALJ could include in a revised RFC finding on remand." Jozefyk, 923 F.3d at 498.

The plaintiff also argues that the ALJ's limitation of "attention for two-hour segments" is "entirely inconsistent with the opinion of all medical doctors including but not limited to Doctor Umfleet and Doctor Schramm." Dkt. No. 21 at 10. First, the court has explained that the ALJ did not err in finding Dr. Schramm's opinions unpersuasive. Second, while the plaintiff criticizes the ALJ for relying on Dr. Umfleet's evaluation, see, e.g., Dkt. No. 10 at 20 (arguing that the ALJ erred in relying on Dr. Umfleet's neurological evaluation in finding Dr.

58

Schramm's opinion unpersuasive), the plaintiff does not point to any other "medical doctor" in the record opining that the plaintiff is unable to maintain attention and concentration for two-hour segments.

The plaintiff has not demonstrated that the ALJ erred in accommodating the plaintiff's mental impairments in the RFC, including her moderate limitation in concentration, persistence and pace. The court will not remand on this ground.

F.    Sentence Four Conclusion

For the reasons outlined above, the court will not remand under sentence four of §405(g). The plaintiff has failed to show that the ALJ's finding that the plaintiff was no longer disabled after March 9, 2020 lacked substantial evidence; that the ALJ failed to consider multiple "severe" impairments in crafting the RFC; that the ALJ improperly weighed Dr. Schramm's medical opinion; that the ALJ erred in analyzing the severity of the plaintiff's mental impairments; and that the RFC did not adequately account for the plaintiff's mental limitations.

IV.   Analysis of Request for Remand Under Sentence Six

The plaintiff attached to her initial brief additional medical records that she argues "are new, material to the claim, [were] not available at the time of the hearing, and relate to the conditions discussed at the" hearing before the ALJ. Dkt. No. 10 at 25 (plaintiff's short section titled "Newly Obtained Evidence"). The plaintiff attached two exhibits to the initial brief. Dkt. Nos. 10-1 (which she identifies as "Exhibit A") and 10-2 (which she identifies as "Exhibit

59

B"). The plaintiff emphasizes that the medical records in Exhibit B/Dkt. No. 10-2 show that she "suffers from chronic pain because of neurogenic causes." Dkt. No. 10 at 25 (citing Dkt. No. 10-2). The records in Exhibit A/Dkt. No. 10-1 relate to sleep studies and appointments. Dkt. No. 10-1.[23] The plaintiff cites to these additional records at several points throughout her brief. Dkt. No. 10 at 9, 10, 16, 18. The plaintiff asserts that consistent with Sears v. Brown, this evidence "was not in existence at the time of the hearing" and thus "would have been impossible for Plaintiff to obtain and [it] is material to this case." Dkt. No. 10 at 25 (citing Sears v. Brown, 840 F.2d 394, 399–402 (7th Cir. 1988)).

The Commissioner responds that the plaintiff's "only conceivable use of this post-decision evidence is to obtain a" remand under sentence six of 42 U.S.C. §405(g) "for consideration of new and material evidence." Dkt. No. 17 at 24. The Commissioner argues that to the extent this portion of the plaintiff's initial brief "constitutes a full-fledged argument, it is so perfunctory as to be

---

[23] The plaintiff does not appear to treat the records in Exhibit A as new evidence, indicating in a footnote that these "[r]ecords were submitted to SSA on 7/2/2021 but were not uploaded as part of the Eastern District of Wisconsin case file." Dkt. No. 10 at 9 n.6. The Commissioner treats Exhibit A as "new" evidence. See Dkt. No. 17 at 24. The court notes that Exhibit A contains one sleep medicine outpatient note dated February 15, 2021—*before* the March 1, 2021 hearing and the ALJ's May 5, 2021 decision. This note, at least, is not "new."

There are additional records that the plaintiff supplied to the Appeals Council. See Dkt. No. 9-3 at 3. And the record includes documents supplied to the Appeals Council that were not marked as exhibits before the ALJ. See Dkt. Nos. 9-4, 9-5 at 2–13. These records were submitted to the Appeals Council as part of the plaintiff's request for review of the ALJ's decision. Dkt. No. 9-3 at 3. The Appeals Council found that this evidence did "not show a reasonable probability that it would change the outcome of the decision" and the Appeals Council "did not exhibit this evidence." Id.

60

waived." Id. (citing Schoenfeld v. Apfel, 237 F.3d 788, 793 (7th Cir. 2001)). Nevertheless, the Commissioner notes that the court cannot remand under sentence six "for consideration of additional evidence unless 1) the evidence is 'new;' 2) the evidence is 'material;' and 3) there is 'good cause' for Plaintiff's failure to present the evidence to the ALJ." Id. at 24–25 (citing Sullivan v. Finkelstein, 496 U.S. 617, 618 (1990)). The Commissioner argues that the plaintiff's "three-sentence argument on this topic fails to show that the elements of a sentence six remand have been satisfied." Id. at 25.

At a June 22, 2023 hearing, the court asked the plaintiff to clarify whether she sought dual remand under sentence four and sentence six or if she sought sentence four remand and, in the event that was unsuccessful, then sentence six remand. Dkt. Nos. 25, 26, 27. The plaintiff subsequently confirmed that she was seeking sentence four remand and, alternatively, sentence six remand. See Dkt. No. 29 at 5 (plaintiff's supplemental briefing clarifying that she seeks reversal and an award of benefits or, alternatively, remand under sentence four or, alternatively, remand under sentence six).

In her original brief, the plaintiff provided no argument beyond listing the elements required for sentence six remand and stating that the evidence in Exhibit B did not exist at the time of the hearing and therefore that it "would have been impossible for Plaintiff to obtain . . . ." Dkt. No. 10 at 25. The original brief asserted that this evidence "is material to this case" without any further explanation or argument. Id. The plaintiff did not mention the Exhibit A records at all, despite the fact that with the exception of the February 15, 2021

61

sleep medicine outpatient visit note (Dkt. No. 10-1 at 1-5), those records were not available to the ALJ.

Although arguments raised for the first time in a reply brief are waived, the plaintiff's reply brief added little additional support for her argument that sentence six remand is required:

> The Commissioner rarely mentions [the plaintiff's] pain . . . . Nowhere does the RFC account for chronic and persistent pain at a level of 10/10. It simply is not factored into the RFC. There is no discussion as to how or if pain medication would stabilize the pain; no discussion regarding the intensity or persistence of the pain; and no discussion as to how the pain would affect the length she could sit or concentrate. Put simply, the pain was not accounted for. The newly discovered evidence forces the ALJ to account for the pain and modify the RFC.
>
> [The plaintiff] has shown that the newly discovered evidence is (a) new – unavailable at time of hearing; (b) material – chronic pain at 10/10 is serious and material; and (c) that it would affect the RFC thus changing the outcome. For these reasons a sentence six remand is appropriate.

Dkt. No. 21 at 11–12.

Finally, the court asked the parties to provided supplemental briefing on whether a plaintiff could seek sentence four relief and, if unsuccessful, seek sentence six relief in the alternative. Dkt. No. 26. Although the Commissioner's supplemental brief asked that if the court allowed the plaintiff to make a sentence six argument, the Commissioner be allowed to respond to such an argument "in full," dkt. no. 28 at 2, 5, the plaintiff's supplemental brief did not seek leave to further flesh out the plaintiff's sentence six arguments, dkt. no. 29.

Perfunctory and undeveloped arguments are considered waived. Hall v. Berryhill, 906 F.3d 640, 644 (7th Cir. 2018) (quoting Crespo v. Colvin, 824 F.3d 667, 674 (7th Cir. 2016)). See also Vang v. Saul, 805 F. App'x 398, 403 (7th Cir. 2020); Everson v. Kijakazi, No. 21-CV-716-SCD, 2022 WL 3656462, at *8 (E.D. Wis. Aug. 25, 2022); Cotton v. Kijakazi, No. 21-C-658-LA, 2022 WL 1488203, at *8 (E.D. Wis. May 10, 2022); Kramer v. Saul, No. 19-C-1558, 2021 WL 973936, at *4 (E.D. Wis. Mar. 16, 2021); Lechner v. Barnhart, 330 F.Supp.2d 1005, 1012 (E.D. Wis. 2004). The court will nevertheless briefly consider the plaintiff's arguments.

"Sentence six authorizes a district court to remand without ruling on the merits in two circumstances: when (1) the Commissioner requests a remand before filing her answer and demonstrates good cause, or (2) there is evidence that is new and material, plus a showing of 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" DeGrazio v. Colvin, 558 F. App'x 649, 652 (7th Cir. 2014) (quoting 42 U.S.C. §405(g)). The second scenario applies here.

The Commissioner argues that the medical records in Exhibit A/Dkt. No. 10-1 are not "new" because the appointments took place prior to the ALJ's May 2021 decision. Dkt. No. 17 at 25 (citing Schmidt v. Barnhart, 395 F.3d 737, 742–43 (7th Cir. 2005)). The Commissioner asserts that in Schmidt, the Seventh Circuit found that the evidence was not "new" "because it was in existence and available to the claimant at the time of the administrative

proceeding and the claimant had been 'given ample opportunity to submit them both before and after the hearing.'" Id. (quoting 395 F.3d at 742–43).

It is not quite accurate to say that the ALJ gave the plaintiff "ample opportunity" to submit these records after the hearing. At the hearing, the ALJ confirmed that the most recent exhibits he had as of that time (March 1, 2021) were Exhibits 20F, 21F and 22F. Dkt. No. 9-5 at 19. The plaintiff asked the ALJ to hold the record open for thirty days following the hearing because there were "follow-up sleep studies" that were "being done . . . in the near future." Id. The ALJ declined to hold the record open:

> Well, as this is a Title II claim only with a [sic] expired date last insured of December 31st, 2019, any of those more recent sleep studies are likely not particularly relevant to the time period in question. And so because of that, I'm not going to hold the record open at this time for those additional records.

Id. at 19–20.

The records in Exhibit A/Dkt. No. 10-1 are dated in winter/spring of 2021: February 15, dkt. no. 10-1 at 1–5; March 22, id. at 6–13; March 25, id. at 14–17; April 12, id. at 18–20; April 16, id. at 21–28; and April 27, id. at 29–33. The February 15, 2021 sleep study notes were available at the time of the hearing, and the plaintiff has not explained why she did not provide these records to the ALJ prior to the hearing. But the others post-dated the hearing; the ALJ would have been able to review them only if he had agreed to hold the record open for thirty days so that the plaintiff could submit them. On the other hand, these records appear to have been submitted to the Appeals Council. See Dkt. No. 9-3 at 3. Evidence is "not new for purposes of sentence

64

six" when it has already "been presented to the Appeals Council." DeGrazio, 558 F. App'x at 652 (citing Sullivan, 496 U.S. at 626; Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1269 (11th Cir. 2007)). See also Stepp v. Colvin, 795 F.3d 711, 726 n.8 (7th Cir. 2015) (referring to its earlier ruling in Farrell that "evidence that has been submitted to and rejected by the Appeals Council does not qualify as 'new' within the meaning of § 405(g)") (citing Farrell v. Astrue, 692 F.3d 767, 770 (7th Cir. 2012)).

The Commissioner argues that the court should not remand under sentence six based on the records in Exhibit B/Dkt. No. 10-2:

> While the appointments discussed in Exhibit B are "new" in the sense that they postdate the ALJ's decision, new evidence is only "material" if there is a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. Schmidt, 395 F.3d at 742 (citation omitted). Plaintiff makes no effort to show that the evidence would have had this effect. (Pl. Br. 25.) While the evidence in Exhibit B shows that Plaintiff continued to receive pain treatment, the ALJ already considered a great deal of evidence discussing pain and related symptoms, as discussed above. The evidence in Exhibit B is merely cumulative of evidence already in the record, and it does not "provide a new perspective on the information" available to Plaintiff before the hearing. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003).

Dkt. No. 17 at 25.

In her reply brief, the plaintiff asserted that there had been "significant medical developments since the May 5, 2021 hearing before the ALJ," citing only to the records in Exhibit B/Dkt. No. 10-2:

> First, Doctor Lasquetty referred [the plaintiff] to pain management because of debilitating pain. She was diagnosed by Doctor Draya with neurogenic pain due to central nervous system abnormality. (Ex. B., 3-4). Her pain levels were 10/10. Id. She was ultimately diagnosed with chronic pain. Id. at 2-4.

65

Dkt. No. 21 at 11 (citing Dkt. No. 10-2 at 2–4). The plaintiff also asserts that the Commissioner is incorrect in asserting that the ALJ considered her pain when determining the RFC. Id. The plaintiff states that the ALJ's decision merely mentioned that the plaintiff's "right hand continued to be weaker than her left with pain increased on her right side," dkt. no. 9-3 at 29, and argues that "[n]owhere does the RFC account for chronic and persistent pain at a level of 10/10," dkt. no. 21 at 11. The plaintiff asserts that the "newly discovered evidence forces the ALJ to account for the pain and modify the RFC." Id. at 12. The plaintiff then asserts that she "has shown that the newly discovered evidence is (a) new – unavailable at time of hearing; (b) material – chronic pain at 10/10 is serious and material; and (c) that it would affect the RFC thus changing the outcome," and argues that "[f]or these reasons a sentence six remand is appropriate." Id.

Exhibit B contains records from pain management and neurology office visits from December 1, 2021, dkt. no. 10-2 at 18–19; December 9, 2021, id. at 17–18; December 15, 2021, id. at 10–17; January 7, 2022, id. at 10; and February 1, 2022, id. at 3–9. These are records are "new;" they document appointments that occurred after the hearing date and after the ALJ issued his decision. In her initial brief, the plaintiff cited to these records in support of her assertion that "[s]he is diagnosed with chronic and neurogenic pain that reaches levels of 10/10." Dkt. No. 10 at 18, 9. In her reply brief, the plaintiff asserted that the ALJ's RFC did not "account for chronic and persistent pain at a level of 10/10." Dkt. No. 21 at 11. The plaintiff reported that her "pain

66

severity reaches 10/10" on only one occasion—January 7, 2022. Dkt. No. 10-2 at 10. On February 1, 2022, the plaintiff reported that a recent switch in medications had "some benefit in pain from 7/10 down to a 6." Id. at 3. The records otherwise reflect that the plaintiff reported a pain rating of 6.5/10 on December 1, 2021, and during a December 9, 2021 biofeedback session, pain ratings of 7/10 before the session and 4/10 after. Id. at 17, 19. And the ALJ's decision acknowledged that the plaintiff still experienced some weakness and pain: "She indicated that on a test of fine motor dexterity, her right hand continued to be weaker than her left with pain increased on her right side." Dkt. No. 9-3 at 30, 33.

The plaintiff has not demonstrated that these records are "material." "Evidence is material if there is a reasonable probability that its consideration would have changed the ALJ's decision." Gossett v. Colvin, 527 F. App'x 533, 537 (7th Cir. 2013) (citing Schmidt, 395 F.3d at 742; Perkins v. Chater, 107 F.3d 1290, 1296 (7th Cir. 1997)). The court does not believe there is a reasonable probability that these pain management and neurology records— records which verified the continuance of persistent conditions that the ALJ had factored into his May 2021 ruling—would have changed the ALJ's decision. The ALJ had mentioned that the plaintiff still experienced some pain, and the "new" records in Exhibit B/Dkt. No. 10-2 do not corroborate an ongoing level of pain more intense than the ALJ had mentioned; they show that on one occasion the plaintiff mentioned extreme pain of 10/10 but that medication was improving the plaintiff's pain ratings. Whether an impairment or condition

67

is "well-controlled is relevant to whether [the claimant] achieved medical improvement, because conditions that can be controlled with medication are not disabling." Brown, 799 F. App'x at 919 (citing Prochaska, 454 F.3d at 737).

The plaintiff has not met her burden to demonstrate that a sentence six remand is necessary. The court will not remand under sentence six of 42 U.S.C. §405(g).

## V.     Conclusion

The court **ORDERS** that the final administrative decision of the Commissioner of Social Security is **AFFIRMED**.

The court **ORDERS** that the case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 16th day of August, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**